

# Fourth Court of Appeals
## San Antonio, Texas

### CONCURRING OPINION

No. 04-18-00519-CR

Earl James **OTTER**,
Appellant

v.

The STATE of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2017CR3776
Honorable Laura Lee Parker, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice
Concurring Opinion by: Patricia O. Alvarez, Justice

Sitting:    Rebeca C. Martinez, Justice
            Patricia O. Alvarez, Justice
            Liza A. Rodriguez, Justice

Delivered and Filed: July 10, 2019

Because the majority does not conclude the trial court erred in failing to suppress Otter's

statements to Sergeant Alonzo, I concur in the judgment only.

### DETENTION VERSUS ARREST

"Detentions and arrests both involve restraint on an individual's freedom of movement, but

an arrest involves a comparatively greater restraint." *Crofton v. State*, 541 S.W.3d 376, 376 (Tex.

App.—Houston [14th Dist.] 2017, no pet.) (citing *State v. Sheppard*, 271 S.W.3d 281, 290 (Tex.

Crim. App. 2008)).  Although the law provides no "bright line" rule to distinguish the two, Texas

courts generally characterize the seizure of a person as an "arrest" or "detention" depending upon

several factors: (1) amount of force displayed; (2) duration of the detention; (3) efficiency of the investigative process and whether it was conducted at the original location or the person was transported to another location; (4) officer's expressed intent—whether the officer told the detainee that the detainee was under arrest or being detained; and (5) any other relevant factors. *See Sheppard*, 271 S.W.3d at 290–91. "If the degree of incapacitation appears more than necessary to simply safeguard the officers and assure the suspect's presence during a period of investigation, this suggests the detention is an arrest." *Id*. at 291; *accord Kuether v. State*, 523 S.W.3d 798, 808 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

Determining whether Otter's detention evolved into an arrest requires an analysis of the factors set forth in *Sheppard*. 271 S.W.3d at 290–91.

## A.        Amount of Force and Officer's Expressed Intent

Otter's frustration at his inability to obtain a cigarette prompted the officer's expressions of placing further restraints on Otter. Shortly after the twelve-minute point in the videotape, when Otter first requested an attorney, Otter attempted to obtain a cigarette. At 13:30 on the videotape, Otter asked an officer to retrieve cigarettes from the house. About thirty seconds later, he asked a neighbor to bring him a cigarette. Sergeant Alonzo informed Otter that no one was allowed near him and that an officer would retrieve cigarettes from the house. Otter responded, "If I am under arrest, put me in handcuffs. If I am not, then I will do what I want." Sergeant Alonzo informed Otter that he was being detained and that if he did not cooperate and sit in the chair that he would "put [him] in handcuffs" and in the back of the officer's patrol vehicle. For the next thirty minutes, before Otter was finally provided a cigarette by one of the officers, the video depicts Otter asking anyone in earshot—different neighbors, officers, and individuals walking by the house—for a

cigarette; each time, Sergeant Alonzo sternly directed Otter back into the chair and restricted his movements and contacts.

Although not handcuffed, Otter remained respectful and cooperative under Sergeant Alonzo's direction. Those directions, however, did not allow Otter to leave the two-foot vicinity of the chair in which he was "confined."

## B.      Duration of the Detention

The majority's analysis only addresses the first fifteen minutes of Otter's detention. Otter's detention at the residence continued for over an hour. At approximately fourteen minutes into the videotape, Sergeant Alonzo directly told Otter that he was being detained and Otter's freedom to move was restricted the entire time. Although Otter's oral version of the events did not significantly change after the first twelve minutes, his rambling behavior, the words he chose, and his erratic back and forth nature were all evidence the jury could use to make a conclusion about his guilt.

## C.      Efficiency of the Investigative Process and Transport of Defendant

In an investigative detention, police officers may not ask questions that "are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 298–99 (1980). Although safety concerns were obviously elevated based on the officer's inability to locate the missing 9-millimeter firearm, Sergeant Alonzo's questions were not limited to those of officer safety. During the hour-long time period in question, Sergeant Alonzo continued to ask Otter questions regarding his relationship with Winters, where Otter was when he heard the shot, about the different weapons he owned, and information pertinent to the investigation.

Furthermore, the fact officers waited over an hour to transport Otter from his residence to the Live Oak Police Department, to be interviewed by Texas Ranger Keith Pauska, is also legally

significant. Otter was cooperative with the officers and Otter was detained outside and away from the actual crime scene. Officers attempting to locate items in the residence walked outside and asked Otter questions without incident while he was detained by Sergeant Alonzo. By transporting Otter away from an already safe location to speak to Texas Ranger Pauska, officers restrained Otter's freedom of movement to a degree that appeared more than necessary to safeguard themselves and to assure Otter's presence during the period of investigation. *See Sheppard*, 271 S.W.3d at 291 (observing degree of incapacitation only necessary to assure officer safety and assure suspect presence during investigation); *Rodriguez v. State*, 191 S.W.3d 428, 444 (Tex. App.—Corpus Christi 2006, pet. ref'd) (concluding "[t]he 'least intrusive means' available to determine if appellant was intoxicated was to conduct a field sobriety test at the scene of the accident").

## CONCLUSION

The majority relies heavily on the original report of a suicide to argue that Otter's detention was akin to the short detentions in *Castro v. State*, 373 S.W.3d 159, 165–66 (Tex. App.—San Antonio 2012, no pet.) (concluding officer detained defendant "merely long enough to engage in an investigatory procedure") and *Belcher v. State*, 244 S.W.3d 531, 542 (Tex. App.—Fort Worth 2007, no pet.) (explaining no investigation while waiting for second officer was not unreasonable). Here, Officer Wall and Sergeant Alonzo both expressed their immediate suspicion that something looked awry at the scene, the scene gave them a "bad feeling," and Otter was the focal point of their investigation. Otter was detained at the scene for over an hour before being transported to the police station for an interview with Ranger Pauska. He was unable to talk to neighbors or his autistic daughter; he was confined to a chair on the patio; and he was unable to obtain a cigarette or a bottle of water from his residence.

I would conclude Otter's detention was significantly greater than "simply necessary to safeguard" Sergeant Alonzo, an armed police officer, and the multitude of other armed officers at the scene. *Sheppard*, 271 S.W.3d at 291. The amount of force shown, and the officer's unwillingness to allow Otter to move from the stationary patio chair, or talk to any other individuals, was also unnecessary to "assure [Otter's] presence during [the] investigation." *See id*. Accordingly, I would conclude the trial court erred in failing to suppress Otter's statements to Sergeant Alonzo after the first twelve minutes recorded on Sergeant Alonzo's body camera. However, because I agree the trial court's error did not reasonably affect the jury's deliberation, *see* TEX. R. APP. P. 42.2(a), I concur in the judgment only.

Patricia O. Alvarez, Justice

DO NOT PUBLISH